Peck, J.,
delivered the opinion of the court on the demurrer :
John Gr. Johnson, administrator de honis non of John Rush, deceased, late a sailing-master in the United States navy, represents by his petition that the decedent was commissioned a sailingvmaster in the navy in 1806; that he remained in aetive service until 1810, when he became insane ; and that in September of that year he was placed in a hospital, where he continued until his decease, which occurred on the 9th of August, 1837. That the decedent received half pay as sailing-master up to the 31st of July, 1813. On the 12th of March, 1849, a claim for arrearages of pay was presented to the government, which was not adjusted. On the third of March, 1851, upon an estimate furnished by the Navy Department, Congress directed that the sum of $6,038 06 should be paid to the administrator, as the petition states, for half pay from 1st of August, 1813, to the 9th of the same month, 1837, the day of the death of John Rush.
Interest is claimed upon the above sum from the 12th of March, 1849, to the 12th of July, 1851. In addition to interest, it is now claimed that full pay should be allowed, with commutation of rations, from 20th of September, 1810, to 9th of August, 1837, making the sum of $12,538 27.
To this petition, which is very argumentative, the deputy solicitor has filed a demurrer, which was argued ex parte, the claimant neglecting to appear.
• We do not think that this petition has any merits, either in law or equity.
The estate was generously dealt with by Congress, and there can be but little doubt that the appropriation made by it was offered with *173 the expectation that it would be accepted as a satisfaction of the entire claim, which has now become too stale to meet with encouragement, especially after the favorable consideration given to the estate of the decedent, who did not in his lifetime give any equivalent for the bounty bestowed.
We think the Attorney General reached á correct conclusion in .his construction of the laws of Congress, referred to in the petition as a foundation for this claim, in his opinion of March 14, 1854, to be found in vol. 6, p. 372, of the Opinions of the Attorneys General. This opinion furnishes a satisfactory answer to the pretensions of the claimant.
We furnish the following extracts from the opinion, as applicable to the case :
By the third section of the act of 1806, providing for a naval peace establishment, the officers are to receive “no more than half their monthly pay during the time when they shall not be under orders for actual service.”
The argument filed for the administrator of Sailing-master Rush contends that the words “ but the said officers shall recéíve no more than half their monthly pay during the time when they shall not be under orders for actual service” are to be confined exclusively to the thirteen captains, nine master commandants, seventy-two lieutenants, and one hundred and fifty midshipmen previously mentioned.
That construction discards the meaning and sense of the statute and violates the approved rules for the exposition of statutes.
Every statute ought to be expounded, not according to the letter, but according to the meaning — Qui hcsret in litera, hceret in cortice— “ for words, which are no other than the reverberation of the air, do not constitute the statute, but are only the image of it. It is not the words of the law, but the internal sense of it, that makes the law,” &c., &c.; the learned Attorney General here citing many authorities in support of his opinion.
Again : he says “ the intent of the legislature is not to be collected from any part or expression taken by itself, but on all the parts of the statute together;” citing 3d Coke, 59, b; Co. Litt. 381, a; XIX Yiner’s Ab. Statutes, (E. 6,) pi. 81, 89, 90, pp. 519, 520; Dwarris on Statutes, 587. * * * * * *
Further on in this opinion it is said: “But the argument filed for the administrator of Sailing-master Rush erroneously assumes, in effect and consequence, that the President of the United States would, in the first instance, and for all future occasions, select and designate by *174 name thirteen captains, nine master commandants, seventy-two lieutenants, and one hundred and fifty midshipmen, to be called into actual service when needed; and that these, 1 the said officers,’ and no others, were to receive no more than half their monthly pay during the time when they were not under orders for actual service, while all other officers not so designated for actual service were to stay at home, receiving their monthly pay. Therefore, that Sailing-master Rush, not being of the class of officers designated for actual service, nor being in actual service, but placed for insanity in the lunatic hospital of the State of Pennsylvania, was entitled to full pay.”
“ That cannot be the meaning of the law. On the contrary, the President, when this or that vessel was designated for actual service and to be put in commission, would then assign to such vessel such number of officers, and of such grades, as in his opinion the nature of the service and the class or tonnage of the armed vessel required, and not before; and then such officers would be put under orders for actual service, whether captains, master commandants, midshipmen, surgeons, surgeons’ mates, or sailing-masters, and would be entitled to full pay ; and until under orders for actual service, all officers were to be on half pay only.
“ To refer the words ‘ said officers ’ to the thirteen captains, &c., which words were introduced into the act to bridle the discretion of the President as to the naval force which he might keep in actual service in time of peace — to construe these words into an obligation upon the President to designate for actual service the ultimate number before they were needed for actual service — to put all other officers of the navy upon full pay, whilst such as should be designated in advance for actual service were to receive no more than half pay during the time they were not in fact ordered into actual service, is an exposition, in my opinion, contrary to the policy and reasonable meaning of the law.”
The demurrer is sustained and the petition will be dismissed.
Nott, J, delivered the opinion of the court on the motion for a rehearing :
This is a motion to open the judgment rendered upon the demurrer dismissing the petition and for a rehearing. The claimant failed to appear when the case was regularly reached upon the law docket, but the court considered his case upon its merits and dismissed the petition. His counsel now moves for a rehearing upon a printed *175 brief, and in considering the motion' we have again considered the merits.
I differ somewhat from the learnedly intricate reasoning of Attorney General Cushing, (6 Opins., p. 372,) which was adopted as the opinion of this court in the recent decision of the case. The learned Attorney General considers the act “ in addition ” to the act “ supplementary” to the act "providing for a naval peace establishment,” (Act 1806, 2 Stat. L., p. 390,) as merely limiting by indirection the number of vessels to be kept in actual service. That is to say, in his view of the case, the President might retain as many vessels in actual service as he pleased, provided that the number of officers to be employed upon them did not exceed the number prescribed by that act. This number, viz., thirteen captains, nine masters commandant, seventy-two lieutenants, and one hundred and fifty midshipmen, he regards as less than the entire naval force of the United States, and as only the part liable to be called into actual service.
The construction which I put upon these statutes is this : The act of 1801, "providing for a naval peace establishment,” (2 Stat. L., p. 110,) was passed after the Algerine war, and was,to reduce our navy from a war to a peace establishment. The first section of the act provided that thirteen vessels should be retained in service; the second provided that of these thirteen, six should be kept “ in constant service; ” and the fourth provided that the President might retain in ser vice nine captains, &c., &c. The apt of 1806, “ in addition,” (2 Stat. L., p. 390,) is not to be construed as a part of the former act. Its object was not to reduce the navy, but to enlarge it. The second section authorized the President to increase the number of vessels “ in actual service ” from six to thirteen, and the third section increased the number of captains from nine to thirteen, and of lieutenants from thirty-six to seventy-two, and it added to the list nine masters commandant. When this act of 1806 was passed there could have been no supernumerary officers, for the act of 1801 required the President to discharge “ all the other officers in the naval service of the United States.” The number of captains authorized by the act of 1806 also agreed precisely with the number of war vessels retained by the United States. I think, therefore, that the true construction of the statute is, that it contemplated, no more officers being in the naval service of the United States than those mentioned in its third section, and that to this extent the Attorney General’s construction is erroneous.
The counsel for the claimant has argued his case with great ingen *176 uity, and has said more in favor of the construction which he puts upon the statute than I had supposed could be said. But when it is reduced to a proposition, it all comes to this : That the words in the statute, “ the said officers'’ must refer to the thirteen captains, nine commandants, seventy-two lieutenants, and one hundred and fifty midshipmen, because these are the only officers previously mentioned in the act; and that they can not refer to the warrant officers, who are mentioned subsequently, and whose number, for vessels in actual service, is left to the discretion of the President, be'eause the word “said” requires an antecedent.
If my previous construction of the act is correct, the counsel for the claimant evades the absurdity pointed out by the Attorney General, and reduces the question to one less plainly erroneous. But, nevertheless, the statute will still stand with this glaring inconsistency: That the sailing master not under orders for actual service should receive full pay, while the captain, the master commandant, the lieutenant, or the midshipman, in like circumstances, would receive but half pay.
I do not think that this was the intpnt of Congress. The act indeed does not contain the word “officers,” antecedent to the words “ said officers,” except in connection with the captains, commandants, &c., specially enumerated; but it does contain these words : “ The public armed vessels of the United States in actual service in time of peace shall he OFFICERED AND manned as the President of the United States shall direct.” Then follows the specification and enumeration of these officers and men, and the restriction and proviso now under discussion. The words “ said officers,” it seems to me, may relate to the “ officers ” of the enumerated grades — L e., the thirteen captains, &c. — or they may relate to the officers referred to in this general clause at the beginning of the section, as sound sense and the probable intent of the statute may indicate. Now, it would not be a forced construction to supply the logical ellipsis and read : “ The public armed vessels of the United States in actual service in time of peace shall be officered by such officers and manned by such men as the President of the United States shall direct;” or,'without supplying this logical e1lipsis, it would not make very bad English to strike out the intermediate words and read : “ The public armed vessels of the United States in actual service in time of peace shall be officered and manned as the President of the Znited States shall direct, but the said officers shall receive no more than half their monthly pay during the time when they shall not be under orders for actual service.” Either of these readings *177 will render the act consistent and clear, in accordance with the naval policy of that day, and in furtherance of the impartial justice which it was the object of Congress to extend to all the officers of the government. I therefore adopt this as the true construction to be placed upon the statute.
But it is said that this provision was made to apply only to “officers,” and that a sailing master was not an officer within the statutory meaning of that term. It is true that in the army non-commissioned officers are not in a legal sense “officers,” and that in all reports and musters, as well as in statutes, they are classed with the men. The reason of this is, that they are “enlisted men,” and remain always liable to be reduced 'to the ranks. • But in the navy there are three ranks of officers — 1st, commissioned; 2d, warrant; and 3d, petty officers. By the act “to provide a naval armament,” 27th March, 1794, (1 Stat. L., p, 350,) these three classes were established, and midshipmen were ranked as warrant officers. Midshipmen, it will be remembered, are among those officers to whom, it is contended, the term “said officers” should he restricted. The term “officers,” therefore, is admitted to apply to warrant as well as to commissioned officers, inasmuch as it is admitted to apply to midshipmen. The act of 1801 (2 Stat. L., p. 110) also grouped them together, in terms, by providing, (sec. 5) “that all the commissioned and -warrant officers -who shall he discharged as aforesaid shall he entitled to receive four months’ -pay over and above -what may he due to them” Further than this, the act of 1794, which established these grades of officers and fixed the pay of all, classifies the sailing-masters with the commissioned officers in one section, and the petty officers, midshipmen, and seamen in another. By that act it also appears that the sailing-master received the same pay as a lieutenant in the navy, and more than a lieutenant of marines. I therefore think that when the subsequent statute speaks of -the vessels being “officered and manned,” the former term was meant to embrace commissioned and warrant officers, and the latter term petty officers and seamen.
It also may be said that the limitation of the act.of 1806 applied only to vessels “in actual service,” and that Sailing-master Bush was not attached to a vessel in actual service. The act certainly does use that term; “the public armed vessels of the Ukited States in actual service ” is the language. But there are two answers to this objection, if it should be taken.: 1st, that the petition shows that Sailing-master Bush was appointed to an armed vessel in actual service; and, 2d, that it was only for such vessels that the President, under this act, *178 might appoint sailing-masters. Hence, if Sailing-master Rush was appointed to a vessel not in actual service, his appointment was illegal and void, and he was not entitled to even half pay.
I have come to this conclusion without regard to the peculiarities of the case; but its merits are such as deserve a special notice. It appears, by the claimant’s own petition, and the documents to which it refers, that an officer in the navy became insane, not through any meritorious act performed in the line of his duty, but in consequence of a crime committed against the laws of his country, and for which the naval punishment was dismissal from the service. In commiseration for his then prominent family, he is allowed to remain on the Register of the Navy, and three years’ pay is given to his father. Four years after his insanity began, a report reaches the Navy Department of his death, and he is dropped from the Naval Register. His family contradict the report and apply to have him restored, which is refused. Twenty-seven years after he ceased to do duty he dies. Up to this point it may be said, with technical truth, that there was a legal disability preventing him or his heirs from presenting the claim, or otherwise informing the government of his existence. But his heirs still do nothing for twelve years. Then the claim for half pay is thought of, an administrator de bonis non is procured to collect it, and the claim is presented to the department. The department refers it to Congress ; and Congress, with extraordinary liberality, pay to this administrator de bonis non the full amount of his demand,. ($6,038 05,) March 3, 1851.
The administrator next bethinks himself of interest, (November, 1S52,) and actually presents a claim therefor to Congress, which, it is now said, “failed in securing any relief.”
After some little delay the administrator next discovers that an ingenious and technical reading of the statute will enable him to present a new demand on the government, viz., for the other half of the pay for those services which were never rendered. Thereupon he loses “no time in calling the attention of the authorities thereto by a communication bearing date May, 1853.” The Attorney General decides against this in September, 1853, and the claim then rests thirteen years, when (March, 1866) a new administrator is appointed and an action is commenced in this court upon the same claim, which the petition says is “ well founded in lato and equity.” The law has been already discussed; the equity may be very shortly disposed of by quoting a single allegation in the petition, which is in these words:
“ It is true that during that period [twenty-seven years] he [Sailing- *179 master Rush] rendered no service to the government; but the presumption OF LAW WAS THAT HE WAS AT ALL TIMES READY FOR DUTY AND WAITING ORDERS.”
The petition, however, presents two further questions. It is claimed that the act of 1814, (3 Stat. L„ p. 136,) in effect repeals the half-pay provision of the preceding act, and entitles a naval officer on leave to full pay. It is also claimed that the act of 3d March, 1835, (4 Stat. L., p. 755,) raised the pay of a sailing-master on leave from $20 per month to #750 per annum, and that, inasmuch as Congress gave only the lesser sum to the former, the claimant is now entitled to the difference. Without expressing any opinion as to the construction which should be given to these acts, and without expressing any opinion as to whether the dropping of an absent officer from the Navy Register, followed by the refusal of the Secretary of the Navy to reinstate him, is not sufficient evidence of a dismissal, we are of the opinion that the petition furnishes a conclusive defence to these and all other demands.
It appears that the representative of the deceased officer, with a full knowledge of the facts, presented this doubtful claim to Congress and asked only to be paid a certain amount. Congress might justly have stopped at the point when Sailing-master Rush was dropped from the Navy Register; hut Congress took the administrator at his word and paid him all he asked, which was paid and received by accord in satisfaction of a stale and doubtful demand. It is not pretended that he made any mistake in fact; and if he made a mistake in law, the law does not excuse his ignorance.
This case does not commend itself to the court. It rests upon a mere legal technicality, and is possessed of not a single equity or merit. It is chiefly remarkable for the extraordinary kindness and liberality that have been shown on the part of the government, and the persistent efforts that have attended it on the part of the claimants-
The motion to open the default and for a rehearing is denied.